IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
August 15, 2023 Session

**IN RE JONAH B.**

**Appeal from the Circuit Court for Campbell County**
**No. 2019-AJ-577    John D. McAfee, Judge**
_____

**No. E2022-01701-COA-R3-PT**
_____

Father appeals the termination of his parental rights to his child, who was nearly three years old at the time of trial. On appeal, Father disputes that termination of his parental rights is in the child's best interest. We affirm the trial court's determinations as to both the ground for termination and that termination of Father's parental rights is in the child's best interest.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed and Remanded**

J. STEVEN STAFFORD, P.J., W.S., delivered the opinion of the court, in which D. MICHAEL SWINEY, C.J., and THOMAS R. FRIERSON, II, J., joined.

J. Stephen Hurst, LaFollette, Tennessee, for the appellant, Leonard R.H.

Terry M. Basista, Jacksboro, Tennessee, for the appellees, Tasha B.B. and Ronald W.B.

**OPINION**

**I. FACTUAL AND PROCEDURAL BACKGROUND**

On October 2, 2019, Petitioners/Appellees Tasha M.B.B. ("Foster Mother") and Ronald W.B. ("Foster Father," and together with Foster Mother, "Petitioners") filed a petition to terminate the parental rights of Respondent/Appellant Leonard R.H. ("Father") to his child, Jonah, born in April 2018.[1] At the time the petition was filed, the child's mother, Windy S.B. ("Mother") was deceased. The petition alleged abandonment by failure to visit or pay support as the grounds for termination and was filed in the Campbell County

---

[1] In cases involving the termination of parental rights, it is this Court's policy to remove the full names of children and other parties, to protect their identities.

Circuit Court ("the trial court").

Father filed a motion to dismiss the petition on November 4, 2019, arguing that he had visited and supported the child in the four months prior to the filing of the termination petition. Father later filed an answer denying that his parental rights should be terminated.

Trial on the petition was heard on November 20, 2020. At the start of the proceedings, the parties agreed to dismiss the allegations of abandonment and proceed solely on a new ground: severe abuse. Specifically, counsel for Petitioners submitted as an exhibit a September 9, 2019 final adjudicatory and dispositional order from the Campbell County Juvenile Court ("the juvenile court") in which the juvenile court found that "both mother and child tested positive for amphetamines and methamphetamines at birth." And the juvenile court found that both Mother and Father had knowingly exposed the child to drugs. With regard to Father specifically, the juvenile court found as follows:

> [Father's] actions that led to the risk of the minor child's drug exposure were done knowingly. Father admitted during trial that he was using $30.00/day in methamphetamine. Father admitted to smoking methamphetamine 4–5 times per week. Father further admitted to acting violently towards [Mother]. This Court notes that direct evidence was provided at trial that father has been previously diagnosed with Narcissistic Personality Disorder . . . .

The juvenile court also explained that "the damage inflicted upon the minor child [as a result of the drug exposure] in this instance is tangible and severe." As the court explained,

> [t]he child was on a ventilator at birth, required resuscitation and did not have a heart beat for the first four (4) to five (5) minutes of life. The child was diagnosed with moderate pulmonary stenosis and has required constant supervision since birth. These physical ailments inflicted upon the child are a direct result of the decisions made by [Mother] and [Father].

As such, the juvenile court ruled that the child was the victim of severe abuse by both Mother and Father. Counsel for Father did not dispute the juvenile court order or that it served as a proper basis for termination under the ground of severe abuse.

The child's maternal grandmother, Helen T. ("Grandmother") first testified to the circumstances surrounding the child's birth and placement with Petitioners. The child was born three weeks premature, having been exposed to drugs in utero. The child spent the first three months of his life in the Neonatal Intensive Care Unit ("NICU"), where he was placed on a ventilator and feeding tube to combat the prematurity and "meth addiction." Mother was also hospitalized and on a ventilator for a time after the child's birth. During this time, the Tennessee Department of Children's Services ("DCS") became involved in the case and asked Grandmother to take custody. Grandmother agreed, believing that

Mother would "get it together" upon her release from the hospital. But when Mother was released from the hospital, she used drugs again. So Grandmother encouraged her to find an outside placement for the child when he was released from the hospital. Mother was connected to Petitioners by a family friend and chose them to take her baby. After Mother informed DCS of her choice, Petitioners were permitted to visit the child in the hospital.

In contrast, Father was not permitted to visit with the child at the hospital, as Grandmother explained that neither DCS nor Mother wanted Father to see the child due to the past domestic violence. The record indeed demonstrated that Mother was awarded orders of protection against Father in 2016 and shortly after the child's birth in 2018, based on allegations of physical abuse. Grandmother and a family friend both testified that they witnessed Father physically abuse Mother, with Stella W., the family friend, describing an incident where Mother was "being beat to death" by Father before he was pulled away.[2] Father admitted that he pleaded guilty to domestic assault, stalking, and resisting arrest in 2017.[3] Father was ordered to stay away from Mother as a result of these convictions. But in 2018, Father was found to be in violation of his probation for failing to stay away from Mother. Father denied that he had committed any offenses against Mother other than going to her when she called him, which he admitted was a violation of the restrictions on him, but claimed that he did so when Mother threatened suicide.[4] Father admitted that he had spent sixty days in jail "one time" and ninety days in jail "the other time" related to these charges.

Foster Mother testified to her family's involvement with the child in the NICU and upon his release. When the child was released from the NICU, he was immediately placed in Petitioners' custody. The child still had significant medical issues when he was released, including being on supplemental oxygen for over a year following his release. At the time of trial, Foster Mother testified that the child sees seven or eight specialists, including a pulmonologist, an ophthalmologist, a gastrointestinal doctor, a physiatrist, an occupational therapist, and a cardiologist. The child was also recently referred to a neurologist and may see a speech pathologist in the future. His visits to a physical therapist and a dermatologist were discontinued. The child takes several medicines for his lungs, due to chronic lung disease, and medicine for stomach issues. Foster Mother agreed that the child requires "numerous weekly appointments" to see his doctors and specialists. Foster Mother is a stay-at-home parent and is able to take him to all of his appointments. The child's lungs and other medical issues have improved while in the care of Petitioners. According to Grandmother, the child would not be alive today if it were not for the care and attention that he receives from Petitioners.

---

[2] This was one of two incidents allegedly witnessed by Stella W. Both incidents occurred well before the birth of the child.

[3] The case was resolved in 2017, but the conduct that resulted in the charges occurred in 2016.

[4] Mother did eventually die by suicide.

Petitioners have four other children, three of whom live in the home.[5] All of Petitioners' children were adopted from the foster care system. According to Foster Mother, they are not opposed to permitting the child contact with his biological family if the termination of parental rights is granted. Grandmother confirmed that Petitioners have allowed her to maintain a relationship with the child.

Father was permitted visitation with the child after a paternity test was completed around the time of the child's release from the NICU when he was three months old. Father was also permitted to attend half of the child's doctor's appointments.[6] Father attended all of the doctor's appointments that he was permitted until a change by the juvenile court judge mistakenly prevented him from doing so. Father also exercised all of the two hours of weekly visitation that he was allotted, except when circumstances prevented the visitation. Due to the COVID-19 Pandemic, Father's in-person visitation was changed to virtual at the request of the child's doctor. Although Father agreed at trial that COVID-19 could be "a death sentence" for the child, Father objected to this change and insisted that the visitations resume in-person. Then, Petitioners requested to have visitation at a specific location recommended by the child's doctor so as not to endanger the child due to his "already compromised immune system." Father responded via text message that his counsel told him "as soon as this is over and he comes home to not let anyone around him or me" and that the doctor's instructions were merely a recommendation and not an order.[7] Regardless, the in-person visitation resumed with all parties masked while Father stayed six feet away from the child and watched as Foster Mother played with him.

Father generally refuted his part in the child's drug exposure. According to Father, Mother was the original drug user. Father initially denied that he used anything other than pain pills, but eventually admitted that he had done methamphetamine with Mother prior to the child's birth. Still, Father testified that the demise of his relationship with Mother occurred when he suggested during a prenatal appointment that Mother attend drug rehabilitation. Father testified that he stopped using drugs at that point because he desperately wanted a family. But then he relapsed shortly after the child's birth when he learned the extent of the child's injuries. And Father admitted that he has seven other children, none of whom are in his physical custody.[8] Father further admitted that the severe abuse order entered by the juvenile court was not appealed, but he testified that his prior counsel failed to do so when he asked for an appeal. Father also denied that he had physically assaulted Mother, but agreed that he had pleaded guilty to the charge of domestic violence on the advice of the attorney in his criminal case.

---

[5] Petitioners' oldest child is no longer a minor.

[6] Mother was permitted to attend the other half.

[7] At trial, Father claimed that if the child was placed with him, Petitioners "should be able to come and see him."

[8] Father testified that he has five children with his former wife and two children with another woman, in addition to the child at issue in this case. Father did not divorce his former wife until two months prior to the termination trial, but explained that they had been separated for fourteen years.

Father and his former probation officer, Tabitha Davis, testified concerning Father's probation and the turn his life took after the birth of the child. Father was placed on probation with Ms. Davis related to the domestic violence and stalking charges. For the first nine months of his probation, he was noncompliant, failing to report, failing to take drug tests, failing to pay court costs, and failing to complete an alcohol and drug assessment. After his relapse shortly following the child's birth, Father took the initiative to get his life together. Father turned himself in to Ms. Davis for violating his probation, spent approximately ten days in jail and then did everything required of him to be compliant with the terms of his probation. Ms. Davis testified that Father successfully completed a six-month outpatient drug treatment and counseling program, as recommended by his alcohol and drug assessment. Moreover, he is now a volunteer instructor with Celebrate Recovery, visiting jails to speak with inmates and help others get into rehabilitation programs. Father participated in other volunteer work with similar aims; none of Father's volunteer work was required by the terms of his probation. Ms. Davis testified that Father also completed an anger management course, parenting classes, and everything else that DCS asked him to complete. Father worked full time as required, paid all his court costs, and maintained a residence. Additionally, Father participated in every requested random drug screening, all of which were negative for illegal substances.

Father also testified to his employment and his living arrangements. Father works full time in a factory earning $13.00 per hour plus bonuses. Father had also initiated the payment of child support and had been paying child support for the child through income assignment. He testified that in order to take the child to all of his medical appointments, he plans to work the overnight shift and will have Mondays off. Father further explained that he has experience as a caregiver taking care of his mother, who has a health condition. Father also testified that his parents and his girlfriend, who works in the nursing field, would help out.

Father explained that around the time the termination proceedings began, he moved from a house he was renting to his parents' home to save money in the event that he has to pay for an appeal of the termination case. The home has four bedrooms, one of which would be the child's room. Although Father testified that he had furniture for the child, he has not set that room up for the child. Father testified that he planned to buy a home with his girlfriend, who has three children of her own.

Following the conclusion of the proof, the trial court orally ruled in favor of Petitioners. The trial court entered a detailed written order on November 10, 2022,[9] finding

---

[9] Tennessee Code Annotated section 36-1-113(k) provides that "[t]he court shall enter an order that makes specific findings of fact and conclusions of law within thirty (30) days of the conclusion of the hearing." The record contains no explanation for the nearly two-year delay between the hearing in this case and the entry of the written order.

that severe abuse was a proper ground for termination and that termination of Father's parental rights was in the child's best interest. From this order, Father now appeals.

## II. ISSUES PRESENTED

In this appeal, we resolve two questions: (1) whether the trial court erred in finding clear and convincing evidence to support the severe abuse ground for termination; and (2) whether the trial court erred in finding clear and convincing evidence to support the finding that termination is in the child's best interest. *See **In re Carrington H.***, 483 S.W.3d 507, 525–26 (Tenn. 2016) ("[I]n an appeal from an order terminating parental rights the Court of Appeals must review the trial court's findings as to each ground for termination and as to whether termination is in the child's best interests, regardless of whether the parent challenges these findings on appeal.").

## III. STANDARD OF REVIEW

Parental rights are "among the oldest of the judicially recognized fundamental liberty interests protected by the Due Process Clauses of the federal and state constitutions." ***Id.*** at 521 (collecting cases). Therefore, "parents are constitutionally entitled to fundamentally fair procedures in parental termination proceedings." ***Id.*** at 511. These procedures include "a heightened standard of proof—clear and convincing evidence." ***Id.*** at 522 (quotation marks and citations omitted). "Clear and convincing evidence is evidence in which there is no serious or substantial doubt about the correctness of the conclusions drawn from the evidence." ***In re Valentine***, 79 S.W.3d 539, 546 (Tenn. 2002) (quotation marks and citation omitted).

In Tennessee, termination of parental rights is governed by statute, which identifies "situations in which [the] state's interest in the welfare of a child justifies interference with a parent's constitutional rights by setting forth grounds on which termination proceedings can be brought." ***In re Jacobe M.J.***, 434 S.W.3d 565, 568 (Tenn. Ct. App. 2013) (quoting ***In re W.B.***, Nos. M2004-00999-COA-R3-PT, M2004-01572-COA-R3-PT, 2005 WL 1021618, at *7 (Tenn. Ct. App. Apr. 29, 2005) (citing Tenn. Code Ann. § 36-1-113(g))). Thus, a party seeking to terminate a parent's rights must prove by clear and convincing evidence (1) the existence of at least one of the statutory grounds in section 36-1-113(g), and (2) that termination is in the child's best interest. *See **In re Valentine***, 79 S.W.3d at 546. "Considering the fundamental nature of a parent's rights, and the serious consequences that stem from termination of those rights, a higher standard of proof is required in determining termination cases." ***In re Addalyne S.***, 556 S.W.3d 774, 782 (Tenn. Ct. App. 2018). The clear and convincing evidence standard applicable here is "more exacting than the 'preponderance of the evidence' standard, although it does not demand the certainty required by the 'beyond a reasonable doubt' standard. To be clear and convincing, the evidence must eliminate any substantial doubt and produce in the fact-finder's mind a firm conviction as to the truth." ***In re S.R.C.***, 156 S.W.3d 26, 29 (Tenn. Ct.

App. 2004) (internal citation omitted).

Because of the high standard of proof in termination cases, the standard of review is somewhat different than our typical standard under Rule 13 of the Tennessee Rules of Appellate Procedure. As the Tennessee Supreme Court recently explained:

> To review trial court decisions, appellate courts use a . . . two-step process, to accommodate both Rule 13(d) of the Tennessee Rules of Appellate Procedure and the statutory clear and convincing standard. First, appellate courts review each of the trial court's specific factual findings de novo under Rule 13(d), presuming each finding to be correct unless the evidence preponderates against it. *In re Taylor B.W.*, 397 S.W.3d 105, 112 (Tenn. 2013); *In re Justice A.F.*, [No. W2011-02520-COA-R3-PT,] 2012 WL 4340709, at *7 [(Tenn. Ct. App. Sept. 24, 2012)]. When a trial court's factual finding is based on its assessment of a witness's credibility, appellate courts afford great weight to that determination and will not reverse it absent clear evidence to the contrary. *Jones v. Garrett*, 92 S.W.3d 835, 838 (Tenn. 2002); *In re Justice A.F.*, 2012 WL 4340709, at *7 (citing *In re M.L.D.*, 182 S.W.3d 890, 894 (Tenn. Ct. App. 2005)).
>
> Second, appellate courts determine whether the combination of all of the individual underlying facts, in the aggregate, constitutes clear and convincing evidence. *In re Taylor B.W.*, 397 S.W.3d at 112; *In re Audrey S.*, 182 S.W.3d 838, 861 (Tenn. Ct. App. 2005); *In re Justice A.F.*, 2012 WL 4340709, at *7. Whether the aggregate of the individual facts, either as found by the trial court or supported by a preponderance of the evidence, amounts to clear and convincing evidence is a question of law, subject to de novo review with no presumption of correctness. *See In re M.L.P.*, 281 S.W.3d 387, 393 (Tenn. 2009); *see also In re Samaria S.*, 347 S.W.3d 188, 200 (Tenn. Ct. App. 2011). As usual, the appellate court reviews all other conclusions of law de novo with no presumption of correctness. *In re Angela E.*, 303 S.W.3d [240,] 246 [Tenn. 2010)].

*In re Markus E.*, 671 S.W.3d 437, 457 (Tenn. 2023).

### IV. Analysis

### A. Grounds for Termination

The trial court terminated Father's parental rights on the ground of severe abuse. *See* Tenn. Code Ann. § 36-1-113(g)(4) (allowing termination of parental rights to be initiated where "[t]he parent or guardian has been found to have committed severe child abuse, as defined in § 37-1-102, under any prior order of a court or is found by the court hearing the petition to terminate parental rights or the petition for adoption to have

committed severe child abuse against any child[.]"). Father does not dispute this finding, which was agreed to be tried at the start of the termination trial. *See State v. McCrary*, No. W2005-02881-COA-R3-JV, 2006 WL 1864502, at *8 n.2 (Tenn. Ct. App. July 6, 2006) (finding that the parties tried by consent a ground for termination that was not alleged in the petition). We agree that this was a proper ground for termination.

In this case, the record reflects that Father was found to have severely abused the child in the juvenile court's final order of September 9, 2019; this order was not appealed. As such, another prior court found that Father committed severe abuse. Tenn. Code Ann. § 36-1-113(g)(4). Further, the question of whether Father committed severe abuse is res judicata. *See generally In re Heaven L.F.*, 311 S.W.3d 435, 439 (Tenn. Ct. App. 2010) ("This court previously applied the doctrine of *res judicata* to prevent a parent from re-litigating whether she committed severe child abuse in a later termination of parental rights proceeding, when such a finding had been made in a previous dependency and neglect action.").

## B. Best Interest

Because we have determined that at least one statutory ground has been proven for terminating Father's parental rights, we must now decide if Petitioners have proven, by clear and convincing evidence, that termination of Father's rights is in the child's best interest. Tenn. Code Ann. § 36-1-113(c)(2); *White v. Moody*, 171 S.W.3d 187, 192 (Tenn. Ct. App. 1994). "When a parent has been found to be unfit by establishment of at least one statutory ground for termination of parental rights, as here, the interests of parent and child diverge, and the focus shifts to what is in the child's best interest." *In re Jude M.*, 619 S.W.3d 224, 244 (Tenn. Ct. App. 2020) (citing *In re Audrey S.*, 182 S.W.3d at 877). If "the interests of the parent and the child conflict, courts are to resolve the conflict in favor of the rights and best interest of the child." *In re Navada N.*, 498 S.W.3d 579, 607 (Tenn. Ct. App. 2016).

According to the version of the statute in place when the termination petition was filed, the trial court was directed to consider the following best interest factors:

(1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;

(2) Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;

(3) Whether the parent or guardian has maintained regular visitation or other contact with the child;

(4) Whether a meaningful relationship has otherwise been established

between the parent or guardian and the child;

(5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;

(6) Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;

(7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol, controlled substances or controlled substance analogues as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;

(8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or

(9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

Tenn. Code Ann. § 36-1-113(i). "This list is not exhaustive, and the statute does not require a trial court to find the existence of each enumerated factor before it may conclude that terminating a parent's rights is in the best interest of a child." *In re M.A.R.*, 183 S.W.3d 652, 667 (Tenn. Ct. App. 2005) (citations omitted).

In this case, some factors clearly favor one party over the other. The trial court found that factor (6), regarding whether child was the victim of abuse and neglect, favors termination, due to Father's history of abuse toward Mother. We agree. The testimony of Stella W. was that Father physically abused Mother in such a way that "she was being beat to death." Although Father disputed that he physically assaulted Mother, he pleaded guilty to domestic assault. And the trial court explicitly found Father's denial not to be credible.

Moreover, the severe abuse finding against Father is conclusive of the fact that Father was involved in the abuse and neglect of the child. *See* Tenn. Code Ann. § 36-1-113(i)(6) (involving whether the child has been the victim of abuse or neglect). Here, Father admitted, rather reluctantly, that he did methamphetamine with Mother, but disputed that he introduced her to the drug. And the trial court once again found that Father was not credible on that issue. Father's drug use during Mother's pregnancy appears to have caused the child significant medical issues that he still combats years later.

Father argues, however, that the trial court's finding on this factor ignores his more recent sustained conduct, which has been devoid of any allegations of abuse. Although we

agree that Father's conduct in the two years prior to trial represents a sustained effort to eschew the kind of behavior that he previously exhibited, this ground may consider both acts that are "now completed" or acts that "continue[] to the present." *See The Chicago Manual of Style* § 5.132 (17th ed. 2017) (explaining that the use of "has with the principal verb's past participle" is the present perfect tense, using "has drunk" as an example). So the trial court was not in error in considering Father's prior bad behavior as relevant to this ground. *Cf.* **In re Gabriella D.**, 531 S.W.3d 662, 682 (Tenn. 2017) (holding that the Court of Appeals was correct in its determination that the child suffered abuse under factor six, even though the abuse had occurred years prior and the mother had made significant improvements). Given Father's past abuse and the harm it caused the child, we must conclude that this factor weighs heavily in favor of termination.

The factors concerning Father's meaningful relationship with the child and the effect of a change in caretaker on the child also weigh in favor of termination. *See* Tenn. Code Ann. § 36-1-113(i)(4) (involving whether the parent has a meaningful relationship with the child), (5) (involving the effect on the child of a change in caretakers). The trial court found that Father does not have a meaningful relationship with the child and that a change in caretakers would be detrimental to him. We agree. Here, Father has had only limited visitation with the child, which was even more limited due to the COVID-19 Pandemic. Moreover, the child's medical issues require that he sees a multitude of doctors for treatment and monitoring. Foster Mother is able to take the child to all appointments and provide for his care due to her occupation as a stay-at-home parent. In contrast, while Father expressed an intent to work overnight, Father's employment could interfere with the child's treatment. Furthermore, Petitioners are the only parents the child has ever known. He is well-integrated into Petitioners' family and has improved in their care.

Father does not appear to dispute that the trial court's findings are supported by the evidence. Instead, Father argues on appeal that he is being penalized for the limited visitation that was put in place by the juvenile court and Mother's family's efforts to keep him away from the child when he was born. But it is also true that shortly after the child's birth, Father chose to use illegal drugs and there had been serious allegations of violence against him. As such, it does not appear entirely unreasonable that he was kept from being a part of his medically fragile child's life during those first few months.

Additionally, we have explained that "the focus of the best interest analysis is not to punish a parent for his or her historically bad behavior or to reward a parent for his or her good behavior; instead, the focus must center on what is best for the child[] at present and in the future." **In re Clara A.**, No. E2022-00552-COA-R3-PT, 2023 WL 1433624, at *9 (Tenn. Ct. App. Feb. 1, 2023) (internal quotation marks omitted) (quoting **In re Gabriella D.**, No. E2016-00139-COA-R3-PT, 2016 WL 6997816, at *22 (Tenn. Ct. App. Nov. 30, 2016) (Stafford, J., dissenting), *rev'd* 531 S.W.3d 662 (Tenn. 2017)). While Father's lack of involvement with the child may not be entirely of his own making, it is clear that he does not have a meaningful relationship with the child and that a change in

caretakers would be detrimental to the child. Thus factors (4), (5), and (6) clearly favor Petitioners.

But other factors clearly favor Father. For example, there can be no dispute that Father has exercised every visitation that he was able to attend. *See* Tenn. Code Ann. § 36-1-113(i)(3) (involving visitation with the child). Indeed, Father's visitation was quite frequent, occurring every week. Father also attended every medical appointment he was permitted and able to attend. The proof also shows that Father has paid child support for this child; although there was testimony of a child support arrearage, it appears from the testimony that this arrearage may relate to Father's other children. *See* Tenn. Code Ann. § 36-1-113(i)(9) (involving child support). Finally, the trial court's limited findings on factor (2) suggest that the trial court found this factor in favor of Father. We agree. Even though DCS was involved in the case at the outset, there was no proof that DCS ever made any reasonable efforts to assist Father. *See* Tenn. Code Ann. § 36-1-113(i)(2) (involving whether the parent has made lasting adjustment after reasonable efforts by social services agencies). Instead, much of the significant progress that Father has made appears to be of his own making. So factors (2), (3), and (9) clearly favor Father.

The remaining factors are less clear. The trial court found that factor (1), concerning the parent's adjustment of circumstances so as to make the home safe and in the child's best interest to return, favored termination. *See* Tenn. Code Ann. § 36-1-113(i)(1). In making this finding, the trial court relied on its concerns that Father would not be able to meet the child's considerable medical needs. Father disputes this finding on the basis that trial court ignored the proof concerning the positive improvements that he has made in his life in the past two years. It is true that Father has made many adjustments in his drug abuse, criminality, and domestic violence. Father certainly should be commended for his commitment to forsaking his past misconduct. But elsewhere in its order, the trial court expressed concern about these adjustments because Father continued to deny his culpability for many of his convictions and actions. *See **In re Estrella A.***, No. M2022-00163-COA-R3-PT, 2022 WL 17091958, at *17 (Tenn. Ct. App. Nov. 21, 2022) (considering the mother's denial of culpability for abuse as relevant to the best interest analysis). And the question of whether it is in the child's best interest to be placed in Father's home must be considered in light of the child's serious medical needs, which require considerable effort to tackle. The circumstances of this case, including the severity of the child's issues and the threat posed by COVID-19, have simply not allowed Father to demonstrate that he is capable of meeting the child's medical needs. So we conclude that this factor slightly favors termination.

Likewise, the trial court appears to have found that both factors (7) and (8) favor termination. *See* Tenn. Code Ann. § 36-1-113(i)(7) (involving the parent's physical environment and the people living there), (8) (involving whether the parent's mental and emotional health would be detrimental to the child). With regard to factor (7), the trial court relied almost exclusively on Father's history of drug abuse and his refusal to take

responsibility for his role therein. It is true that Father was abusing drugs both prior to and after the child's birth. Father's criminal convictions and the testimony at trial also showed that Father was violent toward Mother in the past. But there can be no dispute that Father has been sober and free from criminal activity for the last two years. There was also no evidence that Father's current home, with his parents, is not a suitable physical environment for the child, other than the fact that the child's room has not been set up.[10] As such, we must conclude that this factor weighs against termination.

The same is largely true of factor (8). The trial court found that Father's living situation—that he lives with his parents, rather than in his own, separate housing—was evidence that he was "not in a stable place right now." While Father's choice to save his money for an appeal may have been better spent securing housing for himself, again, there is no evidence that Father's current housing is unsuitable or would not be a proper, safe, and stable place for the child, even given his medical issues. Even more importantly, we have little understanding of how Father's choice to live with his parents, ill-advised though the trial court found it, has any relevance to the question of Father's mental or emotional status. Instead, the proof is scant as to Father's mental or emotional health, other than the testimony that he is sober, has successfully completed drug treatment and counseling, and is helping others in their own drug abuse journeys. As such, we likewise conclude that this factor weighs against termination.

Accordingly, following our review, four factors favor terminating Father's parental rights and five factors weigh against termination. However, "[a]scertaining a child's best interests does not call for a rote examination of each of Tenn. Code Ann. § 36-1-113(i)'s nine factors and then a determination of whether the sum of the factors tips in favor of or against the parent." *In re Audrey S.*, 182 S.W.3d at 878. Instead, "[t]he relevancy and weight to be given each factor depends on the unique facts of each case. Thus, depending upon the circumstances of a particular child and a particular parent, the consideration of one factor may very well dictate the outcome of the analysis." *Id.* (citing *White*, 171 S.W.3d at 194). In many cases, the lack of meaningful relationship between the parent and child and the detrimental effect of a change in caretakers are the two most important factors in determining a child's best interests. *See, e.g.*, *In re Madilyn B.*, No. M2023-00035-COA-R3-PT, 2023 WL 7158074, at *8 (Tenn. Ct. App. Oct. 31, 2023) (stating that "the most important factors are the lack of any meaningful relationship between the child and Father and the detrimental effect that a change in caretakers and environment would cause as a result"); *In re Kailyn B.*, No. E2021-00809-COA-R3-PT, 2022 WL 9577148, at *15 (Tenn. Ct. App. Oct. 17, 2022) (same).

Likewise, in this case, the facts clearly demonstrate that the child has no meaningful relationship with Father and that he would be negatively affected by a change in caretakers.

_____

[10] Father testified without dispute that he had furnishings for the child, but that they were currently being stored. Father then testified that he had a bed set up for the child in his own room.

The change in caretakers factor is especially relevant in this particular case because the evidence demonstrates that the child is medically fragile and requires consistent, comprehensive care from his caregivers. Indeed, the trial court also considered the custody best interest factors contained in Tennessee Code Annotated section 36-1-106, concluding that many favored termination due to the child's medical needs and Petitioners' history of, and ability to continue, meeting those needs compared to Father. *See* Tenn. Code Ann. § 36-1-113(i) (noting that the court "shall consider" the listed factors, but that the court "is not limited to" those factors). We agree with the trial court that these facts weigh heavily in favor of termination.[11]

Here, the proof shows that while Father necessarily focused on his own need to treat his drug addiction, his anger issues, and his criminality in the years following the child's birth, Foster Mother has been able to focus on the child's care for the entirety of his life. In her care in particular, the child has improved to being off oxygen and no longer is required to see some of his previous doctors. And while Father did attend all of the child's medical appointments that he was permitted to, his ability to respond to the child's unique, significant medical needs has not been tested in any respect.

Even more, Father's own conduct has indicated that he sometimes places his own interests above that of his child's health. For example, Father insisted on in-person visitation with the child during the COVID-19 Pandemic, despite the risk to the child. And Father threatened that he would not allow the child to interact with Petitioners if he was awarded custody of the child, apparently with little thought as to how having no contact with his lifelong caregivers may negatively impact the child. Moreover, Father spoke during trial of his desire to have a family "worse than anything" when he learned of the child's existence; Father, however, has apparently had seven other opportunities to have a family and currently has custody of none of his older children. Indeed, much of Father's own desire for the child is focused on him being given the opportunity to parent his child, with little discussion of what is best for the child or even of his love for the child. We have previously held that it is often not in a child's best interest to remove him from his safe, stable caregiver to return the child to a parent who has not adjusted their "me-first attitude." *In re Jaydin A.*, No. M2018-02145-COA-R3-PT, 2019 WL 6770494, at *8 (Tenn. Ct. App. Dec. 12, 2019).

The trial court also found it significant that Petitioners were more willing to facilitate a relationship with Father than Father was with Petitioners. As a reminder, Petitioners have allowed the child to have a relationship with Grandmother and allow their other children to see their biological families. While Father later denied he would do so, Father at one point threatened to prohibit the child from having any contact with Petitioners should the child be placed in his custody. So, then Father would remove all contact from

---

[11] We need not tax the length of this Opinion with discussion of each of the section 36-1-106 factors, as many involve facts that have already been considered with regard to other factors.

the only caregivers the child has ever known to suit his own desires, with little apparent concern for the child's emotional health. *See In re Makendra E.*, No. W2015-01374-COA-R3-PT, 2016 WL 325481, at *5 (Tenn. Ct. App. Jan. 27, 2016) ("To remove the child from the only home she has ever known, and where she has lived for eight years, would likely have a detrimental effect on the child's emotional and psychological condition.").

As previously discussed, the focus in the best interest analysis is what is best for the child, not whether Father deserves to have his child returned to him due to the progress that he has made. *See In re Navada N.*, 498 S.W.3d at 607; *see also In re Frederick S.*, No. W2018-00941-COA-R3-PT, 2018 WL 6819355, at *7 (Tenn. Ct. App. Dec. 26, 2018) ("The focus of this analysis is on what is best for the child, not what is best for the parent."). Here, the child is in a safe, stable home that is meeting his challenging medical needs. This home is the only one that the child has ever known. Although Father's recent improvements are certainly to be commended, "we cannot help but acknowledge the overwhelming sense that the child's life will not be improved by a reintroduction to Father." *In re Madilyn B.*, 2023 WL 7158074, at *8. Instead, the situation presented here is similar to another presented to this Court, where we explained that the "foster family understands the challenges that the child may face and the work that is required to meet those challenges, and has the desire to adopt the child permanently into their family. In foster family's embrace, the child's needs have been met and he has been making improvements[.]" *In re Harley K.*, No. E2021-00748-COA-R3-PT, 2022 WL 1154140, at *12 (Tenn. Ct. App. Apr. 19, 2022) (involving a child that receives "occupational therapy once a week, speech therapy once a week, and will be beginning in-home behavioral therapy[,]" in addition to seeing "quite a few doctors"). Under these circumstances, we conclude that the trial court did not err in ruling that Petitioners presented clear and convincing evidence that termination was in the child's best interest.

## V. CONCLUSION

The judgment of the Campbell County Circuit Court is affirmed, and this matter is remanded for further proceedings consistent with this Opinion. Costs of this appeal are taxed to Appellant, Leonard R.H., for all of which execution may issue if necessary.

s/ J. Steven Stafford
J. STEVEN STAFFORD, JUDGE

- 14 -